720 F.2d 1086
 3 Soc.Sec.Rep.Ser. 193, Medicare&Medicaid Gu 33,506
VILLA VIEW COMMUNITY HOSPITAL, INC., a nonprofit
corporation, Plaintiff-Appellant,
v.
Margaret H. HECKLER,* Secretary of Health and
Human Services, Defendant-Appellee.
 No. 81-5713.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 4, 1982.
Decided Nov. 21, 1983.
 
 1
 Gail Anderson, Weissburg & Aronson, Inc., Los Angeles, Cal., for plaintiff-appellant.
 
 
 2
 Peter W. Bowie, Asst. U.S. Atty., San Diego, Cal., Alan M. Gressin, Atty., Dept. of Health & Human Services, Washington, D.C., for defendant-appellee.
 
 
 3
 Appeal from the United States District Court For the Southern District of California.
 
 
 4
 Before FLETCHER and NELSON, Circuit Judges, and EAST,** Senior District Judge.
 
 EAST, Senior District Judge:
 
 5
 The Secretary of Health and Human Services (Secretary) disallowed reimbursement under the Medicare Act[1] for amortization of land use costs claimed by Villa View Community Hospital (Villa View). The District Court affirmed the Secretary's disallowance and Villa View appealed. Because we find the Secretary's action lacks a rational basis and is unsupported by substantial evidence, we reverse.
 
 A. FACTS
 
 6
 Villa View was formed as a nonprofit corporation to (1) purchase the ongoing hospital operation of Villa View Hospital, Inc. (VVH), a proprietary corporation, and the land, building and equipment which VVH was leasing from a partnership; and (2) expand the hospital from 52 to 99 beds. Villa View proposed to finance the acquisitions and expansion by issuing tax-exempt subordinated hospital revenue notes.
 
 
 7
 Normally, Villa View could not issue tax-exempt bonds and notes. However, in Revenue Ruling 63-20, the Internal Revenue Service held that nonprofit corporations, such as Villa View, could issue tax-exempt securities "on behalf of" a political subdivision if the corporation and political subdivision fulfilled certain requirements.[2] The political subdivision must (1) approve the specific obligations to be issued by the private nonprofit corporation; (2) have a beneficial interest in the corporation while the indebtedness remains outstanding; and (3) upon retirement of the obligations, obtain full legal title to the property of the corporation.
 
 
 8
 Villa View undertook the actions necessary to fulfill the requirements of Revenue Ruling 63-20. These actions consisted primarily of (1) obtaining the participation of the City of San Diego as the political subdivision;[3] (2) structuring Villa View's Articles of Incorporation to meet the requirements of 63-20,[4] and (3) entering a note agreement which would serve as the Bond Indenture.[5]
 
 
 9
 On the basis of the actions taken by Villa View and the San Diego City Council, the Internal Revenue Service, in a private letter ruling, ruled that the interest on Villa View's proposed securities would be tax exempt.
 
 
 10
 Villa View then sought to amortize certain costs in connection with the land which Villa View had acquired from the partnership.[6] In Villa View's Medicare cost reports for the periods ending December 31, 1974, and December 31, 1975, Villa View included as reimbursable costs amortization of the acquisition costs. Villa View's accountants believed that amortization of the acquisition costs was proper because they perceived that Villa View had the right to use the land only for a determinable period of time, extending no further than the year 2008. At that time, the Bonds would be repaid and title to the hospital would be transferred to the City. Villa View perceived its land use "rights" as the functional equivalent of a leasehold.
 
 
 11
 Following the filing of the cost reports, Villa View's fiscal intermediary,[7] Blue Cross of Southern California, denied these land use costs. Villa View then requested a hearing before the Provider Reimbursement Review Board (Board).[8] In its decision, the Board ruled against Villa View on the land use costs. The Board stated that although "generally accepted accounting principles might require the amortization of land use costs, the Board finds Medicare principles to imply that such costs are not allowable."
 
 
 12
 On review, the Secretary affirmed the ultimate result of the Board, but the Secretary supplied his own findings and legal conclusions. The Secretary concluded that Villa View's interest in the property is not necessarily limited in duration. The Secretary further concluded that Medicare regulations and principles preclude reimbursement for land use costs, and that generally accepted accounting principles prohibit amortization of the costs. Finally, the Secretary concluded that the City and Villa View are "related organizations" within the context of 42 C.F.R. Sec. 405.427, which would also preclude reimbursement. It is these findings and conclusions which we must review.
 
 
 13
 Following the Secretary's decision, Villa View sought judicial review.[9] The District Court affirmed the Secretary's decision. Although the District Court found the Secretary's decision to be supported by substantial evidence, the court did not describe any of this evidence.
 
 B. STANDARD OF REVIEW
 
 14
 The standard of review is governed by 42 U.S.C. Sec. 1395 oo(f)(1) (Supp.1983). This section provides that the Administrative Procedure Act, 5 U.S.C. Secs. 701, et seq., governs the review of the Secretary's decision. Under 5 U.S.C. Sec. 706(2), our review is limited to determining whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.[10] Mercy Hospital and Medical Center, San Diego v. Harris, 625 F.2d 905, 907 (9th Cir.1980).
 
 
 15
 Under the arbitrary and capricious standard, we will give due deference to the Secretary's interpretation of his own regulations where he has expertise in the substantive area involved and where the regulations were promulgated pursuant to congressional authorization. White Memorial Medical Center v. Schweiker, 640 F.2d 1126, 1129 (9th Cir.1981). However, the deference which we afford the Secretary's interpretation of his regulations is not total:
 
 
 16
 We must ... examine the interpretation itself in light of the language of the regulations. The words must be reasonably susceptible to the construction placed upon them by the Secretary, both on their face and in light of their prior interpretation and application. The interpretation must sensibly conform to the purpose and wording of the regulations.
 
 
 17
 Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 131 (9th Cir.1980) (citations omitted).
 
 
 18
 Under the substantial evidence standard of review, we must affirm a finding where there is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20, 86 S.Ct. 1018, 1026-27, 16 L.Ed.2d 131 (1966), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), even if it is possible to draw two inconsistent conclusions from the evidence. Illinois Central Railroad Co. v. Norfolk & Western Railway Co., 385 U.S. 57, 69, 87 S.Ct. 255, 262, 17 L.Ed.2d 162 (1966). We are not confined, however, to those portions of the record which the Secretary cites in support of his conclusions; we will review the record as a whole, Packer Transportation Co. v. United States, 596 F.2d 891, 894 (9th Cir.1979), and take into account whatever in the record clearly detracts from the weight of the evidence, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); Memorial, Inc., 655 F.2d at 912.
 
 C. DISCUSSION
 
 19
 The Secretary based his decision to disallow Villa View's amortization of land use costs on four conclusions.[11] First, title to the land will not necessarily vest in the City in 2008, and therefore, there is no determinable life over which to amortize the cost of acquisition. Second, Medicare regulations and principles preclude reimbursement of land use costs. Third, even if Medicare regulations and principles are inapplicable, generally accepted accounting principles do not permit amortization of land use costs. Fourth, Villa View and the City are "related organizations" under 42 C.F.R. Sec. 405.427 and this requires denial of reimbursement. Each of these conclusions is discussed below.
 
 1. Title to the Land will Vest in 2008
 
 20
 Unless Villa View's land use rights are limited in duration, Villa View cannot amortize the cost of acquiring the rights.[12] Villa View argues that the rights are limited in duration because title to the land must vest in the City following repayment of the Bonds in 2008. The Secretary concludes, however, that title to the land will not necessarily vest in the City when the Bonds are repaid. As a consequence, the duration of Villa View's land use rights would be indeterminable, and Villa View could not amortize the cost of acquiring the land use rights. In support of his conclusion, the Secretary offers three arguments.
 
 
 21
 The Secretary first argues that the City merely has an option to accept title to the property in 2008; the City can refuse to accept title if it so chooses. Therefore, title will not necessarily ever vest in the City.
 
 
 22
 The evidence in the record, however, contradicts this argument. Although the Bond Indenture provides the City with an option to take title to the property, this option can be exercised only if Villa View defaults on the Bonds. Upon default, the City has an option to purchase the property for an amount sufficient to redeem the outstanding Bonds. The evidence in the record is clear, however, that the City is obligated to take title to the property following Villa View's retirement of the indebtedness. The City Council adopted a Resolution which obligated the City to accept title.[13] The Senior Chief Deputy of the San Diego City Attorney's office stated in an affidavit that it was his "opinion that the City of San Diego is bound by law to accept said Deeds and Bills of Sale when they are presented to the City of San Diego by the escrowholder" after repayment of the Bonds. The record also contains a letter from a law firm employed by the City Attorney's office to offer advice on the specialized tax-exempt financing:
 
 
 23
 We note that the referenced IRS regulations require the vesting in the City of the property acquired with the tax exempt bonds and note proceeds upon retirement of the debt. This transaction has been structured and the documents drafted by the corporation to insure that requirement.... The City must take title when the bonds and notes are retired. While the City may not then be bound legally to continue to hold title or to operate the property as a hospital facility, title will vest in the City upon retirement of the bonds and notes. This is not an optional requirement under the documents.
 
 
 24
 Although the Secretary acknowledges the existence of the above evidence, the Secretary makes no attempt to refute the evidence. Moreover, the Secretary offers no evidence to support his position that the City is not obligated to accept title in 2008.[14] The Secretary's first argument therefore lacks a rational basis.
 
 
 25
 The Secretary next argues that Villa View's Articles of Incorporation allow the corporation to retain title by extending the debt. The Articles of Incorporation provide that the City will receive title to the property on the retirement of all indebtedness incurred to acquire and expand the hospital facility. The Secretary claims that Villa View will need to incur additional indebtedness to finance maintenance and repairs, and that this additional debt will preclude a transfer of title to the City.
 
 
 26
 The evidence in the record again fails to support the Secretary's argument. The indebtedness referred to in the Articles of Incorporation (to acquire and expand the hospital facility) is the obligation secured by the Bonds. The Bond Indenture requires these obligations to be repaid by 2008, and upon repayment, the City will receive title to the land. The Bond Indenture also prohibits Villa View from incurring any additional long term debt and requires Villa View to place certain sums in a renewal and replacement fund for repairs, renewal or replacement of the facility. The record also shows that Villa View executed a Bill of Sale and Grant Deed for the hospital facility and property. Villa View placed these documents in an irrevocable escrow, with instructions that they be delivered to the City on redemption of the Bonds and Notes. Thus, the Secretary's second argument lacks support in the record.
 
 
 27
 The Secretary's third argument concerns a provision of the Bond Indenture which allows the release of land from the Indenture.[15] This provision permits Villa View to request the City to release unimproved land from the Bond Indenture.[16] The Secretary argues that this provision could allow the release of all land, reasoning that some type of natural disaster could destroy the existing hospital structures, or that deterioration of the physical plant would require its being razed. All of the land would then be "unimproved" and subject to release. On this basis, the Secretary claims that it is uncertain whether the City will ever obtain title to the land.
 
 
 28
 Once again, the Secretary ignores the evidence in the record. In the Bond Indenture, Villa View agreed to rebuild in the event of any damage to or destruction of the facility.[17] Villa View also covenants to maintain the hospital facility in good condition, repair and working order. Contrary to the Secretary's assertions, improved land cannot become "unimproved" land subject to the release under the Bond Indenture.
 
 
 29
 In summary, the Secretary's conclusion that title will not necessarily vest in City upon repayment of the Bonds is based on unsupported speculation and is contradicted by the evidence in the record. Villa View's rights to use the land will cease to exist no later than 2008, when the Bonds are repaid. Therefore, the cost of acquiring the land use rights can be amortized if generally accepted accounting principles so provide and there are no contrary regulations.
 
 2. Medicare Regulations
 
 30
 The Secretary argues that even if the land use rights have a determinable life, several Medicare regulations and policies preclude reimbursement for land use costs.[18] The Secretary first cites 42 C.F.R. Sec. 405.415, entitled "Depreciation: Allowance for depreciation based on asset costs." The Secretary notes that this regulation allows only for depreciation of buildings and equipment. From this, the Secretary concludes that because the cost of land is not cited as a depreciable asset, it is therefore not subject to depreciation. The Secretary also cites Section 104.6 of the Provider Reimbursement Manual[19] because it defines land as nondepreciable. Finally, the Secretary alleges that Medicare's general policy is to deny reimbursement costs for depreciation of an asset the use of which is perpetual and not subject to exhaustion.
 
 
 31
 The Secretary's reliance on these regulations and policies is misplaced. As a general rule, the cost of acquiring rights to land is not subject to amortization or depreciation. This general rule, however, is inapplicable here. Land is not generally amortizable or depreciable because it has a perpetual existence and is not normally subject to wear and tear or obsolescence.[20] Villa View, however, is not attempting to amortize or depreciate the cost of acquiring an asset with perpetual use. Villa View's use of the land is for a limited time. Villa View must relinquish all land use rights when the bonds are repaid. Furthermore, Villa View cannot sell the land, acquires no equity in the land, and is restricted in its use of the land. The regulations and policies cited by the Secretary preclude amortization of an asset with perpetual use. Here, however, the asset has no perpetual life for Villa View. The regulations and policies cited by the Secretary are inapplicable to such an asset, and the Secretary cannot rely on them to disallow the land use costs without being arbitrary and capricious.
 
 
 32
 The Secretary also argues that reimbursement of the land use costs would result in an abuse of the Medicare Trust Fund. The Secretary, however, fails to provide us with any evidence to support this argument. The Secretary further argues that the costs should be disallowed because "[o]ne of the primary policy goals is to conserve the Medicare Trust Funds." We find this argument unpersuasive. If a provider's claim for reimbursement is in conflict with the Medicare Act and regulations, then reimbursement must be disallowed. Where the provider's claim is consistent with the Act and regulations, however, reimbursement must be allowed. The Secretary cannot deny reimbursement simply to save money.
 
 
 33
 The regulations and policies which the Secretary cites do not, in fact, apply to Villa View's amortization of the land use costs. Therefore, the Secretary cannot rely on them to disallow the costs. Since the Secretary failed to cite any regulation which does apply, generally accepted accounting principles must be examined to determine whether the land use costs are reasonable costs and should be reimbursed.[21]
 
 3. Generally Accepted Accounting Principles
 
 34
 The Secretary argues that generally accepted accounting principles prohibit the amortization of the land use costs. The Secretary, however, fails to cite any portion of the record in which there is testimony or other evidence to the effect that the land use costs should not be amortized. Although the Secretary had a full opportunity before the Board[22] to introduce expert evidence, the record is devoid of any such evidence to support the Secretary's argument. No accounting experts were called to testify in support of the Secretary's argument. The Secretary, instead, attempts to have us rule in his favor by attacking the credibility of the testimony of Villa View's experts.[23] We find this unpersuasive.
 
 
 35
 Although the Secretary fails to support his argument with any evidence in the record, there is extensive evidence to support Villa View's position that generally accepted accounting principles require amortization of the land use costs. Each of the accounting experts who testified at the hearing agreed that the costs should be amortized. The independent accounting firm which prepared Villa View's certified financial statements concluded that generally accepted accounting principles allow amortization of the land use costs. Also, three national accounting firms contacted by the intermediary stated that the costs in question were properly amortized.
 
 
 36
 We cannot affirm a finding by the Secretary which lacks any support in the record. The Secretary's finding that generally accepted accounting principles preclude amortization of the land use costs is completely unsupported by the evidence in the record. The only finding supported by the evidence in the record is that generally accepted accounting principles allow amortization of the land use costs.
 
 4. Related Organizations Principle
 
 37
 The Secretary's final basis for disallowing the reimbursement of the costs is the "related organizations" regulation, 42 C.F.R. Sec. 405.427. This regulation provides that where a provider obtains facilities from a related organization, the cost of acquiring the facilities that Medicare will reimburse is the cost to the related organization. The purpose of the related organizations doctrine is to avoid inflated purchase prices where the provider effectively purchases goods or services from itself through a controlled or owned organization. The Secretary argues here that the converse is also true; if a provider transfers facilities to a related organization, the facilities may be viewed as being transferred by the provider to itself. Thus, if Villa View's facility, including land, is transferred to the City in 2008, the land use rights would have an indeterminable life since the facility and the land would be transferred by Villa View to itself.[24]
 
 
 38
 We find no merit in the Secretary's application of the doctrine to Villa View and the City. The related organizations principle in the regulation applies only where the organization is related to the provider by "common ownership" or "control." 42 C.F.R. Sec. 405.427(a).[25] The Secretary argues that the City "controls" Villa View, and, therefore, the City and Villa View are related. "Control" exists, however, where "an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." 42 C.F.R. Sec. 405.427(b)(3). The Secretary alleges that the City has influenced and directed the actions of Villa View and that the City may continue to do this. The Secretary fails, however, to list any action taken by the City which significantly influenced or directed the actions of Villa View.[26] The Secretary cannot rationally rely on this regulation as a basis for his disallowance of Villa View's land use costs.
 
 CONCLUSION
 
 39
 Villa View's land use rights are limited in duration. The rights will end when the bonds are repaid in the year 2008 and the City obtains title to the land and hospital facilities. Since the Secretary failed to suggest any Medicare regulation which in fact precludes the costs, generally accepted accounting practices must be applied to determine whether the land use costs can be amortized and reimbursed. The uncontradicted expert evidence in the record requires a finding that generally accepted accounting practices allow amortization of Villa View's land use costs. Therefore, amortization of Villa View's land use costs are reasonable costs under the Medicare Act and should be reimbursed.
 
 
 40
 The District Court's decision is reversed and the cause is remanded for further proceedings.
 
 
 41
 REVERSED AND REMANDED.
 
 FLETCHER, Circuit Judge, concurring:
 
 42
 I concur in the majority opinion, but write separately to emphasize my understanding that in holding that the cost of Villa View's land use rights is reimbursable under the Medicare Act, we intimate no view as to what that cost is. The cost of the land use rights is a factual determination, which the Secretary must make. The cost of the right to the use of the land for a limited period may be less than the cost of a fee simple interest in the land. To determine the dollar amount that may be amortized, the value of the benefit received by Villa View in return for the transfer of the remainder interest to the City must be deducted from the sum Villa View paid to the partnership for a fee simple interest in the land. Villa View exchanged the remainder interest in the land for the concomitant right to issue tax-free bonds. The Secretary must make the factual determination of the value of the benefit received for the transfer of the remainder interest, i.e., the value of the right to issue the bonds, and deduct it from the purchase price. The value of the released land must also be deducted. See majority opinion, footnote, 16, supra.
 
 
 
 *
 Pursuant to Fed.R.App.P. 43(c)(1), we substitute the name Margaret H. Heckler, successor to the original appellee Richard S. Schweiker, as the Secretary of Health and Human Services
 
 
 **
 Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 For a discussion of the Act, see Pacific Coast Medical Enterprises v. Harris, 633 F.2d 123, 126-27 (9th Cir.1980); American Medical International, Inc. v. Secretary of Health, Education and Welfare, 466 F.Supp. 605, 609-10 (D.D.C.1979), aff'd, 677 F.2d 118 (D.C.Cir.1981)
 
 
 [2]
 Revenue Ruling 63-20 provides in part:
 The Internal Revenue Service holds that obligations of a nonprofit corporation organized pursuant to the general nonprofit corporation law of a state will be considered issued "on behalf of" the state or a political subdivision thereof for the purposes of section 1.103-1 of the Income Tax Regulations, provided each of the following requirements is met: (1) the corporation must engage in activities which are essentially public in nature; (2) the corporation must be one which is not organized for profit (except to the extent of retiring indebtedness); (3) the corporate income must not inure to any private person; (4) the state or a political subdivision thereof must have a beneficial interest in the corporation while the indebtedness remains outstanding and it must obtain full legal title to the property of the corporation with respect to which the indebtedness was incurred upon the retirement of such indebtedness; and (5) the corporation must have been approved by the state or a political subdivision thereof, either of which must also have approved the specific obligations issued by the corporation.
 
 
 [3]
 Villa View proposed that the City of San Diego, California become involved as the political subdivision on whose behalf the securities would be issued. After several months of negotiation with the City, the San Diego City Council adopted Resolution No. 208434. In this resolution, the City Council obligated the City to accept title to the hospital properties after the bonds were paid off. This Resolution states in part:
 This Council, on behalf of the City of San Diego, hereby accepts from the Corporation the transfer of the hospital facility ... when all of the First Mortgage Hospital Bonds and said Subordinated Hospital Revenue Notes ... have been paid, and hereby agrees that title thereto will vest in the City of San Diego upon such payment and after delivery to the City of San Diego of the Grant Deed and the Bill of Sale on the hospital facility, and hereby accepts the option to purchase the hospital facility before that date upon certain events and conditions specified in said Indenture.
 The City Council also approved the issuance of the tax-exempt bonds on the City's behalf.
 
 
 [4]
 Section 10 of the Articles of Incorporation provides that upon repayment of the bonds, title to the hospital facility shall be conveyed to the City. Section 10 provides in part:
 [U]pon retirement of all of the indebtedness of the Corporation incurred and to be incurred by the Corporation to acquire the hospital facility known as Villa View Hospital and to enlarge, improve and extend the same, the Corporation shall, without further action by the members of Board of Directors, transfer, convey and set over unto the City and its successors in interest, its entire right, title and interest in the Hospital Facility, as defined in the legal instruments securing such indebtedness without further consideration due.
 The Articles of Incorporation also grant the City the right to reject candidates for the Board of Directors and the right to have a non-voting representative at Board meetings.
 
 
 [5]
 Under the terms of the Bond Indenture, Villa View executed and placed in escrow a Bill of Sale and Corporation Grant Deed to the hospital property to be delivered to the City when the bonds are paid off. The Indenture also restricts the manner in which Villa View can use its property and handle its finances prior to satisfaction of the indebtedness on the Bonds and Notes; Villa View cannot incur any liens, except under several specified circumstances, and is prohibited from selling any of the hospital buildings or property. The Indenture also requires Villa View to make periodic payments to a Debt Service Fund and a Renewal and Replacement Fund
 
 
 [6]
 Normally, the cost of acquiring land is not subject to amortization or depreciation and Villa View accepts this. Villa View argues, instead, that its rights with respect to the land in question are different from the normal rights associated with land owned in perpetuity. One of Villa View's accounting experts explained Villa View's position to the Board this way:
 Under generally accepted accounting principles, land which is owned in perpetuity is, generally, not subject to depreciation, nor are the costs of purchase of such land subject to amortization. This is usually accepted as true because land, unlike other fixed assets, generally does not have a limited useful life span. It does not deteriorate with the passage of time, and usually is not physically exhausted through use. The owner is assumed to have the right of enjoyment of the land until, at the owner's option, that right is relinquished. Therefore, depreciation accounting--which aims to distribute the cost of a tangible capital asset over its estimated useful life--is inapplicable to land owned in perpetuity. Similarly, the cost of land owned with infinite service life to the present owner is not subject to amortization; this, again, is because land ordinarily is stable and permanent.
 In those instances where the right to use land is for a period limited in duration and where the land after that period of use will not belong to the present user, the cost of obtaining that right is subject to amortization. For instance, the cost of a leasehold is subject to periodic amortization by reason of the determinable termination date of the right to use. Similarly, the costs of other interests in land which are limited in duration are properly amortized. This is consistent with and required by generally accepted accounting principles.
 If land use rights are obtained under an arrangement where the land is nominally owned but must be surrendered without compensation at a future date, the cost of obtaining the use of such land (less salvage value) should be amortized over the anticipated duration of the use of the land.... Under such circumstances the land itself is not being depreciated; rather, the cost of obtaining the right to use the land is being amortized in such a manner as to permit the matching of revenues and expenses.
 
 
 [7]
 To assist with the administrative task of determining the reasonable cost of a provider's services to Medicare-covered patients, the Act authorizes a provider to appoint certain private organizations (with the approval of the Secretary) as "fiscal intermediaries" to act as agents for the Secretary. These intermediaries review claims for costs and administer payments due hospitals under the program. 42 U.S.C. Sec. 1395h. To determine the costs reimbursed to a provider, the fiscal intermediary reviews and audits an annual cost report filed by the hospital. 42 C.F.R. Sec. 405.406(b). After an audit of the provider's report, the intermediary determines the "reasonable cost" of the reimbursable services which have been provided, and hence the amount due. See 42 C.F.R. Sec. 405.454(f)
 
 
 [8]
 Providers dissatisfied with audit adjustments imposed by the fiscal intermediary may appeal the intermediary's determination to the Provider Reimbursement Review Board. 42 U.S.C. Sec. 1395oo(a). The Board's decision shall be final unless the Secretary--on his own motion and within sixty days of provider's receipt of notice of the Board's decision--reverses, modifies or affirms the Board's decision. 42 U.S.C. Sec. 1395 oo(f)(1)
 
 
 [9]
 A provider dissatisfied with the final decision of the Secretary may obtain judicial review of the decision in federal District Court. 42 U.S.C. Sec. 1395oo(f)(1)
 
 
 [10]
 The substantial evidence test applies to the review of factual determinations based on a record made at a hearing. White Memorial Medical Center v. Schweiker, 640 F.2d 1126, 1129 (9th Cir.1981). Therefore, this standard applies to the Secretary's conclusion that there were no existing generally accepted accounting principles applicable to the subject transaction. The Secretary's other conclusions involved applications of laws and regulations and are reviewable under the arbitrary and capricious standard. However, under any standard of review, all of the Secretary's conclusions must be reversed, since they lack any basis
 
 
 [11]
 The Secretary also concludes that Villa View possesses both legal and equitable title to the land. From this conclusion, the Secretary argues that Villa View's use of the land is perpetual. We need not decide whether Villa View or the City presently possesses equitable title to the land. As we describe more fully in the text of the opinion, title to the land must pass to the City by the year 2008. It is this fact which makes Villa View's interest in the land determinable for accounting purposes, and requires amortization of the land use costs
 
 
 [12]
 See footnote 6, supra
 
 
 [13]
 See footnote 3, supra
 
 
 [14]
 The Secretary does state that one of the instructions for the escrowholder constitutes evidence that title need not necessarily pass to the City. This instruction provides that if the City refuses the Grant Deed and Bill of Sale when the escrowholder delivers them, then the documents should be returned to Villa View. The Secretary argues that this instruction establishes that title may not necessarily pass to the City. The record shows, however, that this instruction is a standard escrow instruction, included at the direction of the escrowholder. The instruction is not evidence that the City can legally refuse to accept title
 
 
 [15]
 Section 7.13 of the Bond Indenture provides in part:
 Release of Unimproved Land. The Corporation [Villa View] may at any time and from time to time request the Trustee to release from the lien of this Indenture and reconvey to the Corporation any portion of the land upon which no building, structure or permanently installed equipment has been placed, and the Trustee shall execute the necessary documents to effect such release and reconveyance upon receipt of the following items:
 * * *
 (5) a written appraisal of the value of the land to be released and reconveyed prepared by a qualified appraiser approved by the Trustee; and
 (6) a check or other payment for the land, in an amount not less than that established by the appraisal ....
 (7) a resolution duly adopted by the City Council of the City approving the release and reconveyance.
 
 
 [16]
 Villa View has requested, and the City Council has approved, the release of undeveloped land under this section. The original cost of acquiring this released land cannot, of course, be included in the cost of acquiring the land use rights to the unreleased land. Only the cost of acquiring the unreleased land can be amortized under our holding
 
 
 [17]
 In the alternative, Villa View may pay over to the trustee all insurance proceeds and other funds in an amount sufficient to redeem all outstanding bonds. At this point, the land would pass to the City
 
 
 [18]
 Hospitals are generally reimbursed for the "reasonable cost" of rendering services to hospital patients covered by Medicare. 42 U.S.C. Sec. 1395f(b). The Medicare Act defines reasonable cost of a service as "the cost actually incurred ... and [this cost] shall be determined in accordance with regulations establishing the method or methods to be used .... In prescribing the regulations ... the Secretary shall consider, among other things, the principles generally applied by national organizations ...." 42 U.S.C. Sec. 1395x(v). Pursuant to this authorization, the Secretary has promulgated regulations governing the reimbursement of providers. See 42 C.F.R. Secs. 405.401-405.488 (1981). As we recently stated, these regulations provide that costs shall normally be reimbursed in accordance with generally accepted accounting principles:
 The Secretary normally follows generally accepted accounting practices, 42 C.F.R. Sec. 405.406(a) (1979), but when these practices do not accurately reflect the cost of patient care, as opposed to the cost of running a business, the Secretary reserves the right to prescribe different accounting practices. See 42 Fed.Reg. 46,292 (1976).
 North Clackamas Community Hospital v. Harris, 664 F.2d 701, 706 n. 16 (9th Cir.1980). Thus, where the Secretary has not prescribed different accounting practices by regulation, the Secretary must apply generally accepted accounting principles to determine whether a particular cost claimed by a provider is reimbursable under the Medicare Act.
 
 
 [19]
 The Provider Reimbursement Manual is a series of provisions issued by the Health Care Financing Administration (the Health and Human Services agency delegated the responsibility of administering the provisions of law which are at issue in this case). These provisions are intended to provide informal guidelines and policies for determining reasonable costs under Medicare
 
 
 [20]
 See footnote 6, supra
 
 
 [21]
 See footnote 18, supra
 
 
 [22]
 The Secretary is represented at the Board by his agent, the fiscal intermediary
 
 
 [23]
 Villa View called several accounting experts to testify before the Board. These witnesses were accepted by the intermediary and the Board as experts in accounting
 
 
 [24]
 The Secretary cites no judicial precedent for his novel interpretation of the statute. We need not decide whether the Secretary's interpretation can stand, however, since we find that the City and Villa View are not related organizations under the statute
 
 
 [25]
 42 C.F.R. Sec. 405.427(a) provides in part:
 Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization.
 
 
 [26]
 We note that there has been no showing that the land in this case was initially sold to Villa View so that the City's land use costs in perpetuity would be disguised as Villa View's amortizable costs during the period of repayment on Villa View's purchase money municipal bonds. In other words, this is not a case where the City transferred its land acquisition costs to the federal government to pay for what would, upon repayment of the bonds, be the City's own facility