UNIVERSITY HOSPITAL, NEW YORK UNIVERSITY MEDICAL CENTER, NEW YORK UNIVERSITY, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.

No. 87 Civ. 1080 (WCC).

United States District Court, S.D. New York.

May 2, 1988.

S. Andrew Schaffer, New York City, Hogan & Hartson, Washington, D.C., (S. Andrew Schaffer, Ada Meloy, New York City, William A. Bradford, Robert F. Leibenluft, Beth L. Rubin, Washington, D.C., of counsel), for plaintiff.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Diogenes P. Kekatos, Sp. Asst. U.S. Atty., Annette H. Blum, Chief Counsel–Region II, Robert Wanerman, Asst. Regional Counsel, Office of the General Counsel, U.S. Dept. of Health and Human Services, New York City, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff, University Hospital, has instituted this action seeking judicial review of a final decision of the Secretary of Health and Human Services. The Secretary affirmed a decision of the Provider Reimbursement Review Board ("the Board") insofar as it held that the Hospital's Cardiovascular Special Care Unit ("CVSCU") did not qualify as a special care unit for the purposes of reimbursement under the Medicare statute, 42 U.S.C. §§ 1395–1395zz (1982). This case is presently before the Court on cross-motions for summary judgment.[1] For the reasons set forth below, plaintiff's motion is granted.

### I. Statutory and Regulatory Background

The Medicare program was enacted to provide health insurance benefits to eligible aged and disabled persons. It is divided into two main parts. This case is concerned with Part A of the Medicare Act, 42 U.S.C. §§ 1395c to 1395i–2, which authorizes payment by the federal government for the reasonable costs of hospital inpatient extended care services, home health services and hospice care. *See* 42 U.S.C. § 1395d.

Under Part A, a participating hospital, known as a provider under the Act, is eligi-

---

**1.** Defendant has described his motion as a motion for judgment on the pleadings. When matters in addition to the pleadings are before the Court, Rule 12(c) of the Federal Rules of Civil Procedure provides that a motion for judgment on the pleadings should be treated as one for summary judgment. Since both parties have asked the Court to review the administrative record, matters outside the pleadings are before the Court, and therefore defendant's motion will be treated as a motion for summary judgment.

ble for reimbursement for the lesser of the "reasonable cost" or the "customary charge" of allowable "inpatient hospital services" provided to Medicare beneficiaries. 42 U.S.C. § 1395f(b).[2] Providers are reimbursed by the federal government, usually through fiscal intermediaries under contract with the Secretary, which act as the Secretary's agents for the purpose of determining the amount of payments for which the provider is eligible. 42 U.S.C. § 1395h. The fiscal intermediary is commonly a private insurance company. Providers are reimbursed under Part A on an interim basis throughout a fiscal year to avoid cash flow problems. 42 U.S.C. § 1395g; 42 C.F.R. § 405.405 (1982) (current version at 42 C.F.R. § 413.60 (1987)).[3] At the end of each fiscal year, every provider must submit a cost report to the intermediary to determine the final amount of reimbursement due. 42 U.S.C. §§ 1395f and 1395g; 42 C.F.R. §§ 405.406 and 405.-453 (1982) (current version at 42 C.F.R. §§ 413.20 and 413.24 (1987)).

The intermediary makes a final determination of the provider's reimbursable costs after reviewing, analyzing and, where necessary, auditing the cost report. The intermediary then issues a final notice of Medicare reimbursement based on the costs claimed in the cost report, called a "notice of program reimbursement" or "NPR", which sets forth the amount and basis for the reimbursement. 42 C.F.R. § 405.1803 (1987); *see also* 42 U.S.C. § 1395x(v)(1)(A). If a provider is dissatisfied with the NPR, it may appeal to the Provider Reimbursement Review Board ("the Board"), provided that three jurisdictional requirements are met: (1) the provider has filed a timely cost report; (2) the amount in controversy is $10,000 or more; and (3) the appeal is filed within 180 days of the date the NPR is mailed to the provider. 42 U.S.C.

§ 1395oo(a); 42 C.F.R. §§ 405.1871, 405.-1875 (1987). A provider who is dissatisfied with a final decision of the Board or of the Secretary may then seek review in federal district court. 42 U.S.C. 1395oo(f)(1); 42 C.F.R. § 405.1877.

Congress has authorized the Secretary to establish regulations for determining reasonable cost for reimbursement purposes under the Medicare Act. 42 U.S.C. §§ 1395f(b)(1) and 1395x(v)(1)(A). The Secretary, must apportion the costs between Medicare and non-Medicare patients based on the share of the services they have received. *Id.*

Pursuant to Congress's delegation of authority, the Secretary has promulgated regulations for the determination of reasonable costs. Under the regulatory definition, "reasonable cost" includes all necessary and proper expenses incurred in rendering services, such as salaries, supplies and administrative costs and maintenance, subject to principles relating to specific items of revenue and cost. 42 C.F.R. § 405.451(c)(3) (1982) (current version at 42 C.F.R. § 413.9(c)(3) (1987)). The final determination of reimbursable "reasonable cost" can be made only on the basis of a provider's annual cost report. 42 C.F.R. §§ 405.-405, 405.406 (current version at 42 C.F.R. §§ 413.20, 413.60 (1987)).

The regulations divide the reasonable costs of inpatient operations into two categories: routine costs, such as room and board and the use of equipment and facilities typically included in a provider's daily service charge, and ancillary costs, such as tests, drugs and other special items and services specifically charged to particular patients. *See* 42 C.F.R. §§ 405.452(b)(1), 405.452(d)(2), 405.452(d)(5) (1982) (current version at 42 C.F.R. 413.53(a)(1), 413.53(b)

2. The provider reimbursement method described herein was in effect during each of the cost reporting periods in dispute in the present case. Pursuant to section 1886 of the Medicare Act, 42 U.S.C. § 1395ww, for all cost reporting periods beginning on or after October 1, 1983, payment is currently made to providers such as plaintiff on a prospective payment system based on a predetermined rate of reimbursement for

each type of service rendered per discharge. *See also* 42 C.F.R. §§ 412.1–412.125.

3. This case concerns the cost reporting years 1981 and 1982. Many regulations have been modified and recodified in the succeeding years. Consequently, most citations are to the regulations in effect at that time, with parenthetical citation to the current version.

(1987)). Routine costs are themselves subdivided into routine costs for general patient care areas, and routine costs for special care units. *See id.* §§ 405.453(d)(7) (current version at 42 C.F.R. § 413.53(a)(1) (1987)). The regulations also specify that routine and ancillary costs must be calculated separately, and using different methods. *Id.* at 405.452(b)(1) (current version at 42 C.F.R. § 413.53(a)(1) (1987)). The dispute here concerns whether the CVSCU's costs should be reimbursed as special care unit costs, a type of routine cost, or as recovery room costs, a type of ancillary cost.

■ Generally, a hospital's Medicare routine costs are determined by multiplying the number of Medicare inpatient days by the average routine cost per patient per day. *See St. Mary of Nazareth Hospital Center v. Schweiker,* 718 F.2d 459, 462 n. 7 (D.C.Cir.1983). The average routine cost per patient per day is determined by dividing the hospital's total allowable inpatient routine costs for the year by the total number of inpatient days. 42 C.F.R. §§ 405.452(d)(7) (1982) (current version at 42 C.F.R. 413.53(b)(1) (1987)).

In 1972, the Secretary realized that this formula did not lead to accurate estimates of the costs for treatment in certain newly developed hospital units that provided specialized, intensive care to the most acutely ill patents. *See Villa View Community Hospital, Inc. v. Heckler,* 728 F.2d 539, 540 (D.C.Cir.1984); Ward, *Third Party Reimbursement Considerations, Special Care Units: A Dilemma for Medicare Reimbursement of Hospitals,* 25 St. Louis U.L. J. 343, 353 (1981). These special care units included intensive care units, trauma units, coronary care units pulmonary care units, and burn units. Because of the nature of the services they provided, these units typically had greater costs per patient than units elsewhere in the hospital. In addition, the units often experienced a higher Medicare patient utilization rate than other patient care areas, because the elderly, who typically were Medicare beneficiaries, had a disproportionate need for intensive services. When the high cost services provided to Medicare beneficiaries was averaged

with the lower cost services provided to non-Medicare patients, the resulting average cost per patient day was well below the actual cost per patient day of the services provided to Medicare beneficiaries. Consequently, the providers were not adequately reimbursed. The separate calculation of average costs per patient day in special care units was intended "'to improve the accuracy of the Medicare reimbursement formula.'" *St. Luke's Hospital of Bethlehem v. Schweiker,* [1981–2] Medicare and Medicaid Guide (CCH) ¶ 31,501 at 9466 (E.D.Pa.1981) (quoting internal Health Care Financing Administration memorandum); *see* 45 Fed.Reg. 54,757 (1980) ("incorporation of these higher costs with general routine costs would unfairly skew the calculation").

To qualify as a special care unit, the unit must comply with objective criteria which the Secretary has established to ensure that costs are properly allocated and that a provider's Medicare reimbursement is as accurate and equitable as possible. These regulations require that a special care unit must meet the following conditions:

(i) The unit must be in a hospital;

(ii) The unit must be physically and identifiably separate from general routine patient care areas, including subintensive or intermediate care units, and ancillary service areas. There cannot be a concurrent sharing of nursing staff between an intensive care type unit and units or areas furnishing different levels or types of care.... Float nurses (nurses who work in different units on an as-needed basis) can be utilized in the intensive care type unit. If a float nurse works in two different units during the same eight hour shift, then the costs must be allocated to the appropriate units depending upon the time spent in those units....

(iii) There must be specific written policies that include criteria for admission to, and discharge from, the unit;

(iv) Registered nursing care must be furnished on a continuous 24–hour basis. At least one registered nurse must be present in the unit at all times;

(v) A minimum nurse-patient ratio of one nurse to two patients per patient day must be maintained....

(vi) The unit must be equipped, or have available for immediate use, lifesaving equipment necessary to treat the critically ill patient for which it is designed. This equipment may include but is not limited to, respiratory and cardiac monitoring equipment, respirators, cardiac defibrillators, and wall or canister oxygen and compressed air.

42 C.F.R. § 405.452(d)(10) (1982) (current version at 42 C.F.R. § 413.53(d) (1987)). Expressly excluded from the definition of a special or intensive care unit are "post-operative recovery rooms, postanesthesia recovery rooms ... and subintensive or intermediate care units." 42 C.F.R. § 405.452(d)(10) (current version at 42 C.F.R. § 413.53(b) (1987)).

## II. *Factual and Procedural Background*

The facts material to this motion are not in dispute and are contained in the administrative record.[4] The University Hospital, which was built in 1962, did not have an open heart surgery program until 1968. The operating room for heart patients was integrated into a preexisting suite of operating rooms located on the sixth floor. The main intensive care units, however, were located on the fifteenth floor. To provide intensive care for heart patients during the initial postoperative period, the Hospital established the CVSCU, a five-bed unit adjacent to its operating room and adjacent to its routine recovery rooms. The CVSCU is separated from the routine recovery rooms by a screen and a column.

The Hospital's decision to locate the CVSCU on the sixth floor was dictated by the medical exigencies of open heart surgery. During the first 24–72 hours after open heart surgery, patients generally are critically ill and require intensive, complex nursing care, which is best provided by a highly trained nursing staff in a special-

ized, intensive care unit. It normally takes between eight and forty-eight hours to stabilize these patients, and until they are stabilized they cannot be transported substantial distances.

Space limitations dictated that the CVSCU have only five beds. Because of this limitation, patients can not remain in the unit for the entire time that they require intensive care. Consequently, after the patients are stabilized in the sixth floor CVSCU, they are transferred to the fifteenth floor Cardiovascular Care Unit ("CVCU") for further intensive care, typically lasting several days. The CVCU is recognized as a special care unit for Medicare reimbursement purposes.

This case originated as a dispute between the Hospital and its designated fiscal intermediary, Empire Blue Cross Blue Shield, over the Hospital's cost reports for the 1981 and 1982 reporting periods. During these periods the Hospital classified its CVSCU costs as special care unit costs. The intermediary, in its audit of the Hospital's cost report, reclassified the CVSCU as a recovery room, and calculated the costs as ancillary costs. The Hospital objected to this classification, and the intermediary visited the CVSCU and the recovery room to conduct a review of the units. Thereafter, the intermediary issued its Notices of Program Reimbursement for the years at issue, reaffirming its classification of CVSCU costs as recovery room costs (R. 576). The amount of Medicare reimbursement in dispute is $233,183 and $292,018, for the fiscal years 1981 and 1982, respectively, for a total of $525,201 (Complaint ¶ 18).

The Hospital appealed the intermediary's classification to the Board, which conducted a hearing on June 18, 1986. The Board denied the Hospital's appeal, stating, "While the CVSCU may have been in the process of evolving into a special care unit, it did not fully meet all the regulatory tests (R. 54)." The Board held, "despite conflict-

---

4. The symbol "R." followed by a page number indicates a citation to the certified record c of the administrative proceeding. Unless otherwise noted, the facts are based on the stipulations of fact, R. 373, and the affidavits of Patricia L. Valoon, Director of Clinical Nursing, R. 375, and Richard J. Donoghue, of the law firm of Ernst & Whinney R. 525.

ing testimony," that the CVSCU was "not clearly and consistently physically and identifiably separate from the remainder of the recovery room," and that there was a "concurrent sharing of nursing supervisory staff." *Id.* The Board also modified the intermediary's computation of the amount of reimbursement due plaintiff.[5]

After receiving comments from the intermediary seeking reversal of the Board's decision with respect to its modification of how costs should be computed, the Secretary reviewed the Board's decision pursuant to 42 U.S.C. § 1395oo(f)(1). By decision dated December 17, 1986, the Secretary affirmed the Board's determination that the CVSCU did not meet the criteria of a special care unit, and modified the Board's computation of the amount of reimbursement due plaintiff (R. 4).[6]

### III. *Discussion*

Review of the decisions of the Secretary are governed by §§ 701–06 of the Administrative Procedure Act, 5 U.S.C. (1982). Under § 706(2), the Court must set aside the Secretary's determinations if they are " 'arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence.' " *Vista Hill Foundation, Inc. v. Heckler,* 767 F.2d 556, 559 (9th Cir.1985) (quoting *Villa View Community Hospital, Inc. v. Heckler,* 720 F.2d 1086, 1090 (9th Cir.1983)).

The Secretary refused to calculate the CVSCU's costs separately from other routine costs because it found that the CVSCU did not satisfy two of the six requirements for classification as a special care unit: (1) it was not physically and identifiably separate from the recovery room area, and (2) it shared nursing staff with the recovery room (R. 9). The Hospital has argued that these findings were not based on substantial evidence.

In determining whether an agency determination is based on substantial evidence, the Court must view the record as a whole. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *Aubeuf v. Schweiker,* 649 F.2d 107, 112 (2d Cir.1981); *Ghazibayat v. Schweiker,* 554 F.Supp. 1005, 1013 (S.D.N.Y.1983). It is not enough that there is some evidence supporting the agency determination; there must be " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938); *Ghazibayat,* 554 F.Supp. at 1013.

■ In concluding that the CVSCU was not physically separate from the recovery room, the Secretary relied on the absence of a fixed wall separating the CVSCU from the recovery room. When viewed in light of the entire evidentiary record, this is an insubstantial basis upon which to find that the CVSCU was not physically and identifiably separate.

The Hospital introduced overwhelming evidence that the CVSCU was physically and identifiably separate from the recovery room. A fixed screen and a column separated the two units (R. 163–64, 197, 378). In addition, both units had separate entryways, and each unit had its own supplies and equipment which were never exchanged (R. 152–53, 161–62, 164, 180–81, 378, 385). Similarly, CVSCU beds were never used for recovery room patients, and recovery room beds were never used for CVSCU patients. This distinction was maintained even in emergencies (R. 165, 198–200, 378). Moreover, there were curtains for privacy around the CVSCU beds, but not the recovery room beds (R. 182).

---

**5.** The Board determined that all charges assessed by the Hospital to CVSCU patients should be included as recovery room ancillary charges for assessment purposes, but that days should not be included in the calculation of the Hospital's average per diem routine care cost (R. 54).

**6.** The Secretary concluded that for patients occupying CVSCU beds at the census-taking hour, inpatient days must be counted and included in the computation of the Hospital's average routine per diem cost. In addition, charges imposed for the use of the CVSCU and recovery room beds must be "grossed up" to an equal charge under 42 C.F.R. § 405.452(a) and (b) (R.7–8). Plaintiff has only appealed the Secretary's determination that the CVSCU does not qualify as a special care unit.

In addition to the physical differences between the two units, a long list of different procedures and policies identifies the two units as separate:

(1) the average length of stay in the CVSCU was much greater than in the recovery room (R. 156–58, 383);

(2) all CVSCU patients were transferred to another intensive care unit where they generally remained for an additional 2–3 days, while 90% of the recovery room patients were transferred to routine care units (R. 146, 383–84);

(3) CVSCU patients required much more complex and sophisticated nursing care than recovery room patients (R. 160–61, 384–85, 503);

(4) the nurse-to-patient ratio was much greater in the CVSCU than in the recovery room (R. 150–51, 383);

(5) the two units had different written policies and procedures (R. 153–54, 380–81, 397–475);

(6) the two units had different criteria for the admission and discharge of patients (R. 155, 381, 477–80);

(7) they each had separate and different orientation programs for staff (R. 206–07, 381, 482–97);

(8) the CVSCU and the recovery room were under the medical supervision of different departments (R. 154–55, 382);

(9) since its inception, the CVSCU had been identified separately and viewed as a special care unit by hospital personnel (R. 172, 197).

The testimony of Ms. Doreen Nelkin–Warantz, an employee of the intermediary, does contain some evidence to the contrary. She testified that there was no screen between the CVSCU and the recovery room on her visit, and that if she were not familiar with the CVSCU she might not have been able to tell that it was physically separate (R. 292, 296–97). Nevertheless, she testified that she was able to tell that the two units were separate (R. 297). In addition, she noted that the appearance of the CVSCU beds and the amount of equipment surrounding them differed from the recovery room beds (R. 293). Even more probative than her hearing testimony, which occurred three years after her visit, is a memorandum which she drafted shortly after her visit. In that memorandum, she stated that the CVSCU "is a five bed unit located in a *separate section* of the main recovery room of University Hospital" (R. 581) (emphasis added).

Thus, the testimony and memorandum of the intermediary's auditor verify that the CVSCU was physically and identifiably separate. The intermediary's ability to identify the boundaries of the CVSCU demonstrates that the CVSCU complies with the purpose of this requirement. As the Ninth Circuit has noted, the physical separateness requirement is intended "as a reasonable means of identifying the special care units and apportioning the costs to them." *Loma Linda University v. Schweiker*, 705 F.2d 1123, 1126 (9th Cir.1983). The apportionment of costs is mandated by the Medicare Act, which provides that "the reasonable cost of services shall be the cost actually incurred." 42 U.S.C. § 1395x(v)(1)(A). Because the intermediary has acknowledged that it could identify the CVSCU, the costs that needed to be apportioned to the CVSCU were readily identifiable despite the lack of a fixed wall.

On appeal, the Secretary has also argued that both the CVSCU and the recovery room relied on the same criteria for discharging patients. In both cases, a patient would not be discharged until his vital signs were stable (R. 157, 181). The Secretary contends that this identity of criteria, combined with the absence of a fixed wall, constitutes substantial evidence of the identity of the CVSCU and the recovery room. When viewed in light of the entire record, however, this evidence is far too insubstantial to support the Secretary's determination that the CVSCU was not physically and identifiably separate from the recovery room.

■ Moreover, the Secretary's interpretation of the separateness requirement is arbitrary and capricious insofar as it requires a fixed wall separating special care units from all other units. As discussed above, the reason for requiring that special care units be physically and identifiably separate is to facilitate the statutorily re-

quired apportionment of Medicare costs for reimbursement purposes. The evidence in this case clearly demonstrates that this can be accomplished without a fixed wall. Thus, there is no valid reason for interpreting the regulations as requiring a fixed wall. Because the Secretary's interpretation of the regulation lacks a rational basis in the governing statute, the Court finds the interpretation arbitrary and capricious. *See Samaritan Health Service v. Bowen,* 811 F.2d 1524, 1528 (D.C.Cir.1987) (Secretary's interpretation of Medicare regulation found arbitrary and capricious when lacking a rational basis); *Loma Linda University v. Schweiker,* 705 F.2d 1123, 1126 (1983) ("regulations must be consistent with and in furtherance of the purposes and policies embodied in the congressional statutes").

■ The Secretary has also denied the CVSCU enhanced reimbursement as a special care unit on the ground that it "shared certain nursing services" with the recovery room (R. 6). The Medicare regulations mandate that "there cannot be a concurrent sharing of nursing *staff* between different levels or types of care." 42 C.F.R. § 405.452(d)(10)(ii) (1982) (emphasis added) (current version at 42 C.F.R. § 413.53 (1987)).

The record demonstrates that there was no sharing of nursing staff. CVSCU staff nurses were never used in the recovery room and the recovery room staff nurses never worked in the CVSCU (R. 166, 200, 229–30). Nevertheless, the Secretary concluded that the Hospital failed to meet the separate staffing requirement because there was a concurrent sharing of nursing *supervisors* (R. 54).

The regulations, however, do not require that each unit have its own separate supervisor working exclusively in that unit, and indeed, such a requirement would make no sense. At some level, in every hospital, a supervisory nurse necessarily will have authority over both special care unit nurses and nurses from other units.

The principal aim of the prohibition against concurrent sharing of nursing staff is to ensure that a purported special care unit truly provides specialized, intensive care. If the nursing staff concurrently worked in an area furnishing a different level of care, there would be no assurance that patients in the special care unit actually received the intensive nursing care that the regulation requires. *See* Preamble to Final Rule Revising Special Care Unit Criteria, 45 Fed.Reg. 54757, 54758 (Aug. 18, 1980). Furthermore, there would be no assurance of compliance with the statutory mandated that the reimbursement would not exceed the costs actually incurred. *See* 42 U.S.C. § 1395x(v)(1)(A). Supervisory nurses, however, are all in management positions, and unlike nursing staff—of which the regulations speak—supervisors generally do not provide patient care. Therefore, the sharing of supervisory nurses does not create the danger that patients in the special care unit will be denied the intensive nurse care that the regulation intended they receive, nor does it raise the specter of Medicare reimbursing the Hospital for services which were not actually provided.

A secondary objective—to ensure that the costs for the CVSCU can be distinguished form the recovery room—also is satisfied where, as here the nursing staffs are maintained separately. Costs of a supervisory nurse can be allocated based on time records. If these are not available, such costs can be allocated entirely to the recovery room. Indeed, such a procedure is mandated in the case of float nurses, which the regulations explicitly permit even though such nurses may not be spending their time exclusively in a special care unit. *See* 42 C.F.R. § 405.452(2)(10)(ii) (1982) (current version at 42 C.F.R. § 413.52 (1987)). This too assures compliance with the statutory requirement that reimbursement be for the costs actually incurred.

■ The Secretary's interpretation of the shared nursing provision has no rational basis in the purpose of the regulations. Therefore, the Secretary's interpretation of the regulations in this case is arbitrary and capricious, as to both the provision against shared nursing, and as to the requirement that the unit be physically and identifiably separate. Moreover, as discussed above, the stated purpose of these regulations is

to assure the proper apportionment of costs between Medicare patients and non-Medicare patients. This apportionment is mandated by statute. 42 U.S.C. § 1395x(v)(1)(A)(i). Consequently, the Secretary's interpretation of the regulations also is not in accordance with the law. Since the Secretary's interpretation of the Medicare regulations at issue in this case is arbitrary, capricious, and contrary to law, and since the record lacks substantial evidence to support the Secretary's determination that the CVSCU was not physically and identifiably separate, the Secretary's ruling is reversed.

### IV. *Conclusion*

For the foregoing reasons, plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment is denied. Settle order on notice.

SO ORDERED.